No. 95.—JOHN A. LAVENDER *et al.* plaintiffs in error, *vs.* WILLIAM J. THOMAS *et al.* defendants in error.

[1.] Mortgages are not, within the Act of 1818, to prevent assignments, by debtors unable to pay all their debts, to some creditors in preference to others.

[2.] It is not unlawful for a debtor, who is unable to pay all his debts, to replace a note for more than thirty dollars, given for one of the debts, with notes for less than thirty dollars, although the effect may be to put the debt secured by that note ahead of the other debts.

[3.] A bill which seeks to have applied to the payment of the plaintiff's demand, exclusively, a fund in which all of the defendants have an interest, is not multifarious.

[4.] A bill prayed among other things, that a contract should be specifically performed: *Held*, that the parties to the contract were proper parties to the bill.

[5.] There are cases in which a person may, in Equity, be sued out of the county of his residence, as cases in which, otherwise, no decree at all could be rendered.

In Equity, in Houston Superior Court. Tried before Judge POWERS, May Term, 1855.

Lavender *et al.* *vs.* Thomas *et al.*

The bill alleges—

1. That, on the 17th Feb. 1852, Wm. J. Thomas and John A. Lavender purchased, jointly, of Reuben H. Slappey and Littleberry Mulkey, five acres of land in the 8th district, a part of No. 92, except the right of way for rail road.

2. A steam mill was then in operation on the five acres; price $2.700 in cash; but taken by Slappey; a note held by Lavender, on A. B. Dulin due 1st Jan. 1853, for $1.500, without any words of negotiability.

3. The note was endorsed by Thomas and Lavender, as guarantor, though it was to be Lavender's part of the purchase money.

4. Thomas and Lavender then executed joint notes to Slappey and Mulkey, for $1.370 93, due 1st Jan. 1853, including interest on payment for mill. Thomas signed first, individually, and then Lavender.

5. That for this consideration Slappey and Mulkey executed their deed, with certain timber privileges to Thomas and Lavender.

6. That immediately after said purchase, and before work with the mill, Thomas and Lavender took in Daniel W. Visscher as an equal partner.

7. That in five or six weeks after the first purchase, Thomas bought out the entire interest of Lavender, but took no deed from him—Thomas paying two hundred dollars in lumber, and assuming the payment of the $1.500 note of Dulin, and the $1.370 93 note, made by Thomas and Lavender to Slappey and Mulkey; Lavender, in the mean time, abandoning all control of the mill.

8. That during all this time, the title papers to the property remained in the possession of Thomas.

9. That after the purchase of Lavender's interest, Thomas had sole possession and control of the lot and mill, with the timber privileges; and made a contract with the rail road company to furnish stringers and cross-ties from Fort Valley to Flint River, ten miles; worth $6 or $8000 gross.

10. That Thomas then purchased of F. H. Cheever, all the saw timber on lot No. 69, and west half of lot No. 59, in the 8th district, and took a deed therefor.

11. That Thomas also purchased of Cheever, timber of the same kind on 200 other acres of land, the deed to which has been lost or mislaid.

12. That the purchase from Lavender, and of the timber from others, was for the joint use and benefit of Thomas and Visscher, who remained in quiet and excluisve possession, with the consent of Lavender, until Sept. 1, 1852, when Thomas, for himself and Visscher, re-sold to Lavender all his former interest in the five acres, except the right of way. The timber and grist-mill, which had been since added, were included in the re-sale to Lavender, upon the understanding between Thomas and Lavender, as follows:

First. That Lavender was to protect and save, harmless, Thomas on the Dulin note guaranty, and on the joint note to Slappey and Mulkey; both given for the five acre lot and mill.

Second. That Lavender was to have the contract with the rail road for stringers and ties.

Third. That Thomas was to continue to hold the titles to the property, as an equitable surety for the payment, by Lavender, of the two notes for $1.500 and $1.370 93.

Fourth. That when Lavender paid off these two large notes, and also $450, which Thomas had paid for the grist-mill and timber privileges, then Thomas was to convey to Lavender the five acres, the steam saw-mill, the grist-mill, and all the timber privileges.

13. That immediately after this bargain with Lavender, he took possession of all the property and used it, realizing on the rail road contract $3.000 or other large sum, besides $1.000 worth of lumber sold to other persons.

14. That Lavender continued to possess and use the mills and other property as his own, until May or June, 1853, when both mills were burned down from the carelessness of Lavender, his agents or servants.

15. That the burning of the mills changed the situation of the premises, and rendered the balance of the property of but little value.

16. That other dealings had taken place between Thomas and Lavender, when, on January 25, 1853, Lavender executed his note to Thomas for Six Hundred and Fifty Dollars, due one day after date.

17. That Thomas had tendered to Lavender, a conveyance for all the mill property and timber privileges, if Lavender would take up or discharge Thomas from the notes for $1.500, and $1.370 93, which he, Lavender, has wholly failed to do.

18. That, by process of law, and for his own safety, Thomas has been compelled to pay off the $1.370 93 note.

19. That Thomas and Visscher are ready and willing, and offer to convey said 5 acres and the timber, upon Lavender's re-imbursing the payments on said notes.

20. That after the burning of the mills, Lavender recognized and claimed the land, mills and timber.

21. That in June, 1853, he was about to remove himself, family and property, beyond the State of Georgia, when Thomas, having previously paid off both the large notes, sued out bail process against Lavender on the $1.500 note, and also on other demands, under which process Lavender was committed to Crawford jail.

22. That about the time of said bail proceeding, Thomas sued out attachments against the property of Lavender, which were dismissed for irregularity.

23. That previous to suing out said bail process and attachment, Lavender had caused a considerable portion of property that he claimed, and had in possession, to be removed to Texas, so that when said process issued, he had no property in Georgia, within the knowledge of Thomas, except the 5 acres of land, the remains of the mill after burning, one negro man, the mill-carts, wagons, &c. horse and buggy, of not much value, and a large two-story house, and the lots thereto attached, in Fort Valley, whereon Thomas now resides.

24. That Thomas, by said attachment, pursued and brought back a negro man, Joe, as the property of Lavender.

25. That two *fi. fas.* from Houston Superior Court, April Term, 1853, in favor of R. H. Slappey *vs.* Lavender, were levied on the house and lot in Fort Valley, which was sold under the levy, on the first Tuesday in November, 1853, by the Sheriff, for $1.580; and after Slappey's *fi. fas.* were paid, or partially paid, James A. Miller's note was taken, he being the purchaser of the house and lot, and the money impounded by order of the Court.

26. That while Lavender was in jail for debt, he "fraudulently, and with intent to cheat, delay and hinder, and avoid the payment of Thomas' debt, and for no other purpose whatsoever," made to Peter Hindsman eighty odd notes, within the jurisdiction of a Justice of the Peace; and also executed to Hindsman a mortgage on said house and lot in Fort Valley, to secure the payment of said smaller notes.

27. That Lavender caused himself to be sued in a Justice's Court of Crawford County upon said small notes, and judgments rendered against him for between twenty-three and twenty-five hundred dollars.

28. That while so in prison, Lavender executed to Harrison J. Sargeant, a mortgage upon ox-carts, mill-carts, and a large quantity of sawed rail road lumber and other articles.

29. That the note on J. A. Miller for $1.580, is a fund in Court, subject to the *bona fide* creditors of Lavender, of which Thomas is one.

30. That the debt to Hindsman is not *bona fide*, real or substantial, but was made or pretended to be created after the arrest of Lavender and while he was in prison, for the "express purpose of covering up, concealing, cloaking and screening the said house and lot in Fort Valley" from the debt of Thomas, for which Lavender was imprisoned.

31. That if the debt to Hindsman ever had any real *bona fide* existence, it was in a large note or notes above the jurisdiction of a Justice of the Peace; and that after the imprisonment of Lavender, he and Hindsman, "for the express ob-

ject, purpose and deliberate intent to cover up and conceal all· the property of the said Lavender from orator Thomas' claim, · combined together to cheat and defraud orator Thomas, and· for that purpose split up and severed the said large note or notes," and then gave the mortgage.

32. That combining to defraud Thomas, suits have been brought, judgments and executions obtained on the small notes, which no doubt will pretend to claim the fund in Court from the sale of the house and lot.

33. That while in prison, Lavender executed small notes to A. D. Kendrick for a previously existing debt, for a sum from $80 to $140, which notes, given to create a fraudulent· advantage to Kendrick, to the prejudice of Thomas, have been sued to judgment.

34. That when Lavender was preparing to abscond, sundry attachments in a Justice's Court were levied on articles of property which had before been mortgaged for a pretended debt to H. G. Sargeant, which property was brought to sale· by a Constable, in Sept. 1853, when Sargeant attended with a mortgage *fi. fa.* issued that morning, and gave notice to bidders that they would buy a law-suit. By this threat he purchased in most of the articles, including some 50 or 60,-000 feet of rail road lumber, stringers and cross-ties, at the· greatly inadequate price of 50 cents per hundred, when the· same was worth from 87½ cents to $1 per hundred feet, saying that he was buying said articles of property for the benefit of Lavender.

35. That Lavender afterwards, by the consent of Sargeant, disposed of said lumber and other property. The mortgage· *fi. fa.* was for between $1000 and $1200, foreclosed in the Inferior Court of Crawford County.

36. That Samuel F. Dickinson obtained judgment against Lavender at July Term, 1853, of Houston Inferior Court, for between $700 and $900. His *fi. fa.* was levied on a negro man, Joe, which Thomas had brought back, on Lavender's flight beyond Flint river, under his attachment; and the·

negro has been sold for $800, under Dickinson's *fi. fa.* and the money is now held up in the Sheriff's hands in Houston County.

37. That Thomas has been at trouble and expense worth $400 or $500, in pursuing and bringing back said negro Joe, and but for his diligence the said negro would not have been placed within the reach of the Sheriff of Houston County. During all which time Dickinson took no active steps to secure himself, but profited by the diligence of Thomas, which the Court ought not to allow him to do.

38. That after Thomas had attached and taken out bail process, Carver & Johnson, combining with Lavender, procured a debt due them to be split up into small notes, which were sued in Justice's Court, and judgment and execution obtained, on which the fund in Court will be claimed, in fraud of the rights of Thomas.

39. That Hindsman has filed his bill, returnable to April Term, 1854, of Houston Superior Court, against R. H. Slappey, J. A. Miller and others, to fix a lien on the money in Court, and have it applied to the mortgage or small *fi. fas.* of Hindsman against Lavender.

The prayer of the bill is, that all claims, judgments, *fi. fas.* mortgages, and every pretended lien adverse to the rights of Thomas may be set aside ; that Sargeant account to Thomas for the true value of the mill, property and timber bought in by him fraudulently ; that the funds in Court from the sale of the house and lot and from the negro Joe, be held up until Thomas can get a decree against Lavender upon his equities, and the funds to be paid over to him, &c. &c.

To this bill the defendants filed a demurrer, upon the following grounds :

1. Because there is no equity in the bill.

2. Because complainants had an adequate Law remedy.

3. Because the bill is multifarious.

4. Because Visscher is improperly made a party.

5. Because the Court has no jurisdiction over the persons

-of the defendants, Hindsman, Sargeant, Dickerson and Car-
ver & Johnson.

6. Because there is no equity in the allegations touching
the burning of the mills.

7. Because there is no equity in the allegations against
Cheever and Kendrick.

8. Because the allegations against Hindsman, are vague,
uncertain and fishing in their character.

9. Because there is no equity in the allegations touching
the claims of Dickerson or Carver & Johnson, and they are
improperly made parties.

After hearing argument, the Court sustained the demurrer
as to the defendants, Harrison J. Sargeant and Samuel F.
Dickerson, and ordered their names to be stricken from the
bill, and over-ruled the demurrer, as to all the other defend-
ants, and Counsel for defendants excepted.

MILLER & HALL; STUBBS & HILL, for plaintiffs in error.

SCARBOROUGH, for defendants in error.

*By the Court.*—BENNING, J. delivering the opinion.

[1.] This Court has in two cases decided that the Act of
1818, to prevent assignments to some creditors in preference
to others, does not affect mortgages made to secure a just
debt. (*Lee and others vs. Brown and others,* 7 *Ga. R.* 276.
*Davis and others vs. Anderson & Bro.* 1 *Kelly,* 176.) To
these decisions I give my assent; but it is not without much
difficulty that I do so. There is certainly ambiguity in the
words of the Act.

The Act being interpreted by these decisions, it follows
that the mere execution of the mortgage to Hindsman and
Sergeant by Lavender, as stated in the bill, was not a viola-
tion of the Act.

The bill, however, states other objections to these mort-
gages.

To the mortgage of Hindsman, the objection stated is, that the debt secured by the mortgage was not *bona fide* real or substantial, but was made, or pretended to be made, after the arrest of Lavender, and while he was in prison, for the "express purpose of covering up, concealing, cloaking and screening the" house and lot mortgaged, from the debt of Thomas; "that if the debt to Hindsman ever had any real *bona fide* existence, it was in a large note or notes above the jurisdiction of a Justice of the Peace; and that after the imprisonment of Lavender, he and Hindsman, for the express object, purpose and deliberate intent to cover up and conceal all the property of the said Lavender from orator Thomas' claim, combined together to defeat and defraud orator Thomas; and for that purpose, split up and severed the said large note or notes, and then gave the mortgage."

This statement is a very uncertain one. The former part of it, however, the part alleging the non-existence of any real debt, has equity in it; and although this part may be in the alternative with the latter part, yet, as under the late Act of Amendments it is amendable, as a matter of course, we will only say that the Court below ought to require it to be amended; and ought, if it is not amended, to dismiss the bill, as to Hindsman.

For in the alternate part of the statement, there is, as it seems to us, no equity. We are not aware of any law which prevents a debtor, unable to pay all his creditors, from "splitting up" a large debt into small ones, so as to enable the holder of that debt to obtain judgment in a Justice's Court sooner than the other creditors who have to sue in the higher Courts may be able to obtain judgments on their debts, and thereby, to enable that debt to get a preference over these. The Act aforesaid, of 1818, is not such a law. That prohibits *assignments*, and assignments only. Equity does not forbid an insolvent debtor to prefer one of his creditors to another. (*Stor. Eq.* §370.) And then, the Act of 1801, amending the Judiciary Acts, as far as they relate to Justice's Courts, gives its express sanction to such a division or

"splitting up" of a large debt as shall bring the debt within
the jurisdiction of a Justice's Court.

[2.] The mere fact, then, that Hindsman's debt was "split
up," so as to be brought within the jurisdiction of a Justice's
Court, was not a fact in which there was, in the opinion of
this Court, any equity.

The objections to the other mortgage, that of Lavender to
Sargeant, it is needless to consider, as the Court sustained the
demurrer as to Sargeant.

[3.] This bill was not multifarious. All the defendants
had an interest in the fund in the hands of the Sheriff. The
object of the bill was to get that fund applied to the pay-
ment of the complainant's debts, in preference to the debts
of any of the defendants. The manner in which this fund
was to be applied, was a matter that concerned all of the
defendants. If so, the bill was not multifarious. *Booth
and another vs. Stamper*, (10 *Ga. R.* 116.)

Visscher was a proper party plaintiff to the bill. One of the
objects of the bill was to compel Lavender to perform his
contract of purchase of the mill, &c. Visscher was joint
owner of the mill, &c. with Thomas when Thomas sold them
to Lavender. The bill containing a prayer that Lavender,
the vendee, should perform what was to be done on his side
of the contract, would have, also, to contain an offer by his
vendors to perform what was to be done on their side.
That there might be such an offer, Visscher, who was owner
of the mills, &c. jointly with Thomas, and one of the ven-
dors, had to be a party to the bill. Visscher was a party to
the contract for the specific performance of which the bill
prayed.

Was the Superior Court of Houston County, the Court
which had jurisdiction of the case?

The defendants, with the exception of Lavender, resided
in other counties than Houston, and he resided in Texas.

The great object of the bill is, to have the fund which is in
the hands of the Sheriff of Houston applied in a particular
way. It is true that no subpœna is prayed against the Sher-

iff of that county ; but the omission of such a prayer against him may have been an inadvertence. A decree is prayed against the fund in his hands. At all events, he may still be added as a party.

Considering the bill, then, as if he were a party to it. We answer the question, by saying that the Court in Houston was the Court which had jurisdiction of this case and of the defendants, although most of them resided, not in Houston, but in other counties.

In *Gilbert vs. Hardwick*, (3 *Kelly*, 575,) this Court say, that "Equity cases are not embraced in the term 'civil cases,' as used in sec. 1, art. 3 of the Constitution." In *Rice vs. Tarver*, (4 *Ga. R.* 582,) they re-affirm this. In the cases of *Jordan vs. Jordan and others*, 12 *Ga. R.* 78, 15 *Ga. R.* 76, 16 *Ga. R.* 446,) there is nothing said by the *Court*, adverse to this position. In the last of these cases I, for myself, express a doubt as to whether the expression, "civil cases," used in the Constitution, does not include Equity cases. I still entertain that doubt, but I cannot, upon a doubt, dissent from the majority of the Court, supported, as they are, by two decisions of this Court and many decisions, (as I am aware,) of the Superior Courts.

[5.] Still, although the words, "civil cases" may not, as used in the Constitution, include Equity cases, yet, under the maxim that Equity follows the Law, Equity cases will generally have to be brought in that county only in which the defendant resides. There may, however, be Equity cases in which it will be impossible to observe the maxim—as cases in which more parties than one are necessary to any decree, and those parties, some of whom reside in one county and some in another. And this case is such a one; for in this case no decree, disposing of the fund in the hands of the Sheriff, can be rendered, unless the case in which it shall be rendered shall be such a case as shall bring some one or more of the persons interested in the fund out of his county, into the county of some other of the persons interested in it.

That being so, the best county in which to bring this suit,

was the county in which the suit was brought.    In that county resided the person who had the fund in his hands, and who was Sheriff of the county, and who, as Sheriff of the county, held the fund.    To require a Sheriff to leave his county to answer a suit, is to require him, for a time, to lay aside his public as well as his private business; and that time may happen to be one when a Court of his own county is sitting, or one which, for some other cause, calls imperiously for his presence in his own county.

The only objection which the bill states to the demand of Carver & Johnson is, that it had been " split up" into smaller demands, that it might be brought within the jurisdiction of a Justice's Court.    This, as we have already seen, was not a good objection.

We think, therefore, that the Court should have sustained the demurrer, so far as Carver & Johnson were concerned.

And this disposes of the case.